**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
CHICAGO DIVISION**

| | |
|---|---|
| MONIQUE WYATT, individually and as the proposed representative of the estate of CHACE WHITE, deceased.<br>　　　　Plaintiff,<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC; and MEAD JOHNSON NUTRITION COMPANY.<br><br>　　　Defendants. | Case No.:<br><br>JURY TRIAL DEMANDED |

### COMPLAINT

NOW COMES, Plaintiff, MONIQUE WYATT, Individually, and as Mother of CHACE WHITE, a deceased Minor, by and through her attorneys, MURPHY LAW FIRM, LLC and COMEAUX LAW FIRM, and complaining of Defendants, MEAD JOHNSON & COMPANY, LLC, and MEAD JOHNSON NUTRITION COMPANY (collectively "MEAD"), Plaintiff alleges as follows:

### NATURE OF THIS ACTION

1.　　This action arises out of the catastrophic and preventable injuries to a newborn baby resulting from Necrotizing Enterocolitis ("NEC"), a devastating and often lethal disease that largely affects preterm babies who are given cow's milk-based formula products.

2.　　The cow's milk-based infant formula products at issue were manufactured and introduced into the market by Defendant, MEAD.

1

3.      Plaintiff, MONIQUE WYATT, brings this cause of action against Defendants to recover for injuries that are the direct and proximate result of Baby Chace's consumption of MEAD's unreasonably dangerous cow's milk-based infant formula products.

## PARTIES, JURISDICTION AND VENUE

4.      Plaintiff, MONIQUE WYATT, is a resident of Louisiana and the mother of CHACE WHITE (hereinafter "Baby Chace"). Plaintiff, MONIQUE WYATT, brings this cause of action against Defendants to recover for Baby Chace's injuries, which are a direct and proximate result of consumption of Defendants' respective unreasonably dangerous cow's milk-based products.

5.      On February 2, 2022, Baby Chase was born at the Willis Knighton Center for Women's Health in Shreveport, Louisiana.

6.      Defendant, MEAD JOHNSON & COMPANY, LLC, also known as MEAD JOHNSON NUTRITION COMPANY (collectively "MEAD"), is a corporation incorporated under the laws of the State of Delaware. In principal place of business and global headquarters is located in Chicago, Illinois.

7.      Defendant, MEAD, manufactures, designs, formulates, prepares, tests, provides instructions for, markets, labels, packages, sells, and otherwise places into the stream of commerce premature infant formula and fortifier products, including but not limited to Enfamil Human Milk Fortifier and Enfacare Powder, in all fifty (50) states, including Louisiana.

8.      This is an action for damages which exceeds the sum of $75,000.00, exclusive of costs, interest, and attorneys' fees.

9.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332, as complete diversity exists between Plaintiff and the Defendants, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

10.     The Court has personal jurisdiction over Defendants because Defendants reside in this District, Defendant, MEAD, is incorporated under the laws of Illinois, and Defendants are authorized to conduct business and do conduct business in the State of Illinois. Defendants have marketed, promoted, distributed, and/or sold its cow's milk-based products in the States of Illinois and New York, and Defendants have sufficient minimum contacts with this state and/or sufficiently avail themselves of the markers in the state through their promotion, sales, distribution, and marketing within this state to render exercise of jurisdiction by this Court permissible.

11.     Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this jurisdictional district. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants' headquarters and/or principal place of business are located in this District and Defendants transact substantial business in this District.

**FACTUAL ALLEGATIONS**
**Baby Chace's NEC Diagnosis**

12.     Baby Chace was born prematurely, at 33 weeks gestation, at the Willis Knighton Center for Women's Health in Shreveport, Louisiana on February 2, 2022. At birth, Baby Chace weighed 3lbs 6.1oz.

13.     After he was born, Baby Chace was sent to the NICU at the Willis Knighton Center for Women's Health in Shreveport, Louisiana.

14.     On or about February 3, 2022 to February 7, 2022, Baby Chace was fed Enfamil Premature formula.

3

15.    On or about February 7, 2022, Baby Chace began showing signs of NEC, with bloody stools.

16.    On or about February 8, 2022, Baby Chace was diagnosed with extensive necrotizing enterocolitis.

17.    On February 8, 2022, Baby Chace underwent emergency surgery for bowel perforation / necrotizing enterocolitis.

18.    On February 9, 2022, Baby Chace underwent another emergency surgery for necrotizing enterocolitis with severe acidosis.

19.    Baby Chace died on February 9, 2022, due to Necrotizing Enterocolitis.

### *Necrotizing Enterocolitis (NEC) and Cow's Milk-Based Feeding Products*

20.    According to the World Health Organization ("WHO"), babies born prematurely, or "preterm" are defined as being born alive before thirty-seven (37) weeks of pregnancy are completed, like Baby Chace. Nutrition for preterm babies, for preterm babies, especially those who are born at a very low birth weight (defined as under 1500 grams) or extremely low birth weight (under 1000 grams) is crucial.

21.    NEC is severe gastrointestinal disorder which develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and die. Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.

22.    Up to 30 percent of infants diagnosed with NEC die from NEC.

23.    Preterm and low birth weight infants are especially susceptible to NEC because of their underdeveloped digestive systems. In fact, NEC is the most frequent and most lethal gastrointestinal disorder affecting preterm infants.

24.     Science and research have confirmed strong links between cow's milk-based products and NEC causing and/or substantially contributing to death in preterm and severely preterm, low birth weight infants, along with many other health complications and long-term risks.

25.     Additionally, advances in science have created alternative formulas and fortifiers that are derived from human milk and other non-cow's milk-based products. Yet, the manufacturers of the cow's milk-based products continue to promote and sell their cow's milk-based products.

26.     As early as 1990, a prospective, multicenter study on 926 preterm infants found that NEC was six to ten times more common in exclusively formula-fed babies than those fed breast milk alone, and three times more common than in those who received formula in addition to breast milk. That same study found that NEC was rare in babies born at more than thirty (30) weeks gestation whose diet included breast milk but was twenty (20) times more common in those fed cow's milk-based formula only.

27.     A study published in 2009 evaluated the health benefits of an exclusively human milk-based diet as compared to a diet with both human milk and cow's milk-based products in extremely premature infants. The results show that preterm babies fed an exclusively human milk-based diet were 90% less likely to develop surgical NEC as compared to a diet that included some cow's milk-based products.

28.     In 2011, the U.S. Surgeon General published a report titled, "The Surgeon General's Call to Action to Support Breastfeeding." In it, the Surgeon General warned that "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis (NEC)." This same report stated that premature infants who are not breastfed are 138% more likely to develop NEC.

29.     In 2012, the American Academy of Pediatrics ("AAP") issued a policy statement that all premature infants should be fed an exclusive human milk diet because of the risk of NEC associated with the consumption of cow's milk-based products. The AAP stated that "[t]he potent benefits of human milk are such that all preterm infants should receive human milk…If mother's own milk is unavailable…pasteurized donor milk should be used."

30.     In 1981, the World Health Assembly ("WHA"), the decision-making body of the world's Member States, developed the International Code of Marketing of Breast-Milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk and outlawed any advertising or promotion of breast milk substitutes to the general public. Pursuant to Article 5.1 of the Code, advertising of breast milk substitutes is specifically prohibited: "There should be no advertising or other form of promotion to the general public [of breast milk substitutes]." In Article 5.2, the Code states that "manufacturers and distributors should not provide, directly or indirectly, to pregnant women, mothers or members of their families, samples of products within the scope of this Code". In addition, the Code expressly prohibits "point-of-sale advertising, giving of samples or any other promotion device to induce sales directly to the consumer at the retail level, such as special displays, discount coupons, premiums, special sales…"

31.     The WHO's 2018 Status Report on this issue noted that "despite ample evidence of the benefits of exclusive and continued breastfeeding for children, women, and society, far too few children are breastfed as recommended." The Status Report states that "a major factor undermining efforts to improve breastfeeding rates is continued and aggressive marketing of breast-milk substitutes," noting that in 2014, the global sales of breast-milk substitutes amounted to US $44.8 billion and "is expected to rise to US $70.6 billion by 2019."

32.     Recognizing a shift in the medical community towards an exclusive human-based diet for preterm and low birthweight infants, the Defendants began heavily promoting "human milk fortifiers," a name which misleadingly suggests that the product is derived from human milk, instead of being derived from cow's milk.

33.     The Defendants have designed competing, systematic, powerful, and misleading marketing campaigns to persuade physicians and parents to believe that: (1) cow's milk-based formula and fortifiers are safe; (2) cow's milk-based products are equal – or even superior – substitutes to breastmilk; and (3) physicians consider their cow's milk-based products a first choice.

34.     Similarly, the Defendants market their products for preterm infants as necessary for growth, and perfectly safe for preterm infants despite knowing of the extreme risks posed by cow's milk-based products and failing to warn the casual link between such products and NEC and resultant risk of catastrophic injuries and/or death.

### *Mead's Enfamil Cow's Milk-Based Products*

35.     Defendant, MEAD's Enfamil products are cow's milk-based products.

36.     At all times material, Defendant, MEAD's Enfamil milk-based products were unreasonably dangerous in that use of those products increased the risk of NEC in infants and replaced the nutritionally safer and superior human milk-based products.

37.     At all times material, Defendant, MEAD's Enfamil cow's milk-based products were unreasonably dangerous to preterm infants in that they significantly increased the risk that the infant would develop NEC.

38.     At all times material, Defendant, MEAD's Enfamil cow's milk-based products were unreasonably dangerous to preterm infants in that they significantly increased the risk that the infant would die.

39.      At all times material, it was well-known that reliance on such products caused and/or contributed to cause an increased risk of infants developing NEC.

40.     At all times material, Defendant, MEAD, was aware of the significantly increased risk of NEC, devastating injuries, and/or death associated with us of its cow's milk-based products, especially in preterm infants.

41.     At all times material, Defendant, MEAD, was aware or should have been aware that its Enfamil cow's milk-based products were not safe for use as it was used with preterm infants like Baby Chace, yet it took no steps to prevent its use in such a situation.

42.     Defendant, MEAD, foresaw or should have foreseen that its Enfamil cow's milk-based products would be used as they were with infants like Baby Chace and knew or should have known that such use would significantly increase the risk of NEC in Baby Chace, yet it took no steps to prevent such use.

43.     Defendant, MEAD's Enfamil cow's milk-based products were not safe to be used as they were with infants like Baby Chace, and Defendant, MEAD, knew or should have known they were unsafe, yet it failed to properly instruct and/or want the FDA, NICU's, hospitals, doctors and parents that its products were not safe.

44.     Defendant, MEAD's Enfamil cow's milk-based products were not safe to be used as they were with infants like Baby Chace and Defendant, MEAD, knew or should have known they were unsafe, yet it failed to provide detailed instructions or guidelines on when and how its products would be safe to use with a preterm infant.

8

45.    Defendant, MEAD's Enfamil cow's milk-based products caused Baby Chace to develop NEC.

*Safer Alternatives*

46.    At all times material, it was well-known that human milk was the best source of nutrition for preterm and low birth weight infants and those otherwise at risk for NEC.

47.    At all times material, it was well-known that a diet based exclusively on human milk and human milk-based products provided all the nutrition necessary to support preterm infants without the elevated risk of NEC associated with cow's milk-based products.

48.    At all times material, a range of options were available that allowed preterm infants to be fed exclusively human milk-based nutrition.

49.    At all times material, an established network delivered pasteurized donor breast milk to hospitals nationwide in addition to the mother's own breast milk.

50.    At all times material, hospitals had access to shelf-stable formula and milk fortifiers derived from pasteurized human breast milk.

51.    At all times material, a mother's own breast milk, donor breast milk, or formula and milk fortifiers derived from pasteurized human breast milk were all safer alternatives to cow's milk-based formula and milk fortifiers, especially for preterm infants.

*Mead's Misleading Marketing of Enfamil Products*

52.    Despite being aware of the significantly increased risk of NEC, devastating injuries, and/or death associated with use of its cow's milk-based products – especially in preterm infants – Defendant, MEAD, engaged in deceptive marketing campaign in which they mislead parents of preterm infants into believing their products were safe and necessary for the growth of those infants.

53.     Notwithstanding strong medical evidence establishing the extreme dangers that cow's milk-based products posed for preterm and low birth weight infants, Defendant, MEAD, marketed its cow's milk-based products as equally safe and nutritionally equivalent alternatives to human milk and have promoted its products as necessary for additional nutrition and growth.

54.     At all times material, Defendant, MEAD, maintained a website which promoted a range of products specifically for "premature and low weight" babies and made claims regarding Enfamil's ability to increase the babies' weight and calorie intake.

55.     Defendant, MEAD's website falsely boasted its commitment to science and claimed that "Enfamil is backed by decades of breast milk research and multiple clinical studies" and that "to create [their] best formulas, [they] collaborated on some of the most extensive breast milk studies to date."

56.     Defendant, MEAD's Enfamil website also specifically targeted parents of premature infants by emphasizing the need for "catch-up growth," which could be achieved by feeding the infant the Enfamil product "Enfacare" as it was "[c]linically shown to promote catch-up growth similar to full-term breastfed infants."

57.     Defendant, MEAD's website devoted to Enfamil premature formula also boasted that it "helps babies with catch-up growth."

58.     None of Defendant, MEAD's marketing materials – including its promotional websites – referenced the scientific data showing how significantly their products increased the risk of NEC, devastating injuries, and/or death.

59.     Defendant MEAD's website devoted to its cow's milk-based products was false and misleading as it created the false idea that those products were created based on the latest science and thus are safe for preterm infants, when in fact, science had proven their cow's milk-

based products significantly increased the risk of NEC, devastating injuries and death in preterm infants.

60.     Defendant, MEAD's website was false and misleading as it created a false equivalency between formula and breast milk and intentionally omitted the established fact that cow's milk-based products have been proven to significantly increase the risk of NEC, devastating injuries and/or death in premature infants.

61.     The statements on Defendant, MEAD's website that indicated that its cow's milk-based products were necessary for "catch-up-growth" in preterm infants were false and misleading as they failed to inform of the risk those products posed of the infant developing NEC.

62.     Defendant, MEAD's marketing campaign was designed to make parents believe that its products were made safe and necessary for the growth of premature infants despite decades of research that established the fact that cow's milk-based products significantly increased the risk of a premature infant developing NEC, devastating injuries, and/or death.

63.     Baby Chace's Mother was exposed to Defendant, MEAD's false and misleading marketing which caused and/or substantially contributed to Baby Chace being fed Defendant, MEAD's cow's milk-based products.

64.     Baby Chace's Mother, members of the medical community, physicians, and hospitals relied upon the representations and advertising of Defendant, MEAD, which categorically omitted the fact that is cow's milk-based products significantly increased the risk of NEC, devastating injuries, and death in premature infants, which caused and/or substantially contributed to the products being fed to Baby Chace.

*Mead's Inadequate Warnings*

65.     Upon information and belief, at all times material, the Enfamil products which Defendant, MEAD, marketed specifically as being safe and necessary for the growth of premature infants, were available at retail locations and online.

66.     Upon information and belief, at all times material, no prescription was necessary to obtain the line of Enfamil products Defendant, MEAD, marketed as being safe and necessary for growth of premature infants.

67.     Despite being aware of the significantly increased risk of NEC, devastating injuries, and/or death associated with use of its cow's milk-based products – especially in preterm infants – Defendant, MEAD, failed to properly warn of the significantly increased risk of NEC, devastating injuries, and/or death associated with the line of Enfamil products, nor of the magnitude of this increased risk.

68.     Despite being aware of the significantly increased risk of NEC, devastating injuries, and/or death associated with use of its cow's milk-based products – especially in preterm infants – Defendant, MEAD, did not provide instructions and/or guidance for how to feed these products in order to avoid NEC, devastating injuries, and/or death.

69.     Despite knowledge that its products were being fed to preterm infants, often without their parents' informed consent, Defendant, MEAD, failed to require or recommend that medical professionals or hospitals inform parents of the significant risk of NEC, devastating injuries, and/or death and failed to require or recommend that parental consent be obtained prior to the products being fed to their babies.

70.     Despite being aware of the significantly increased risk of NEC, devastating injuries, and/or death associated with use of its cow's milk-based products – especially in preterm infants

12

– Defendant, MEAD, made no changes to its products or the products' packaging, guidelines, instructions and/or warnings.

### COUNT I: STRICT LIABILITY – DESIGN DEFECT
#### *Mead Johnson & Co., LLC & Mead Johnson Nutrition Co.*

71.     Plaintiff incorporated by reference each of the preceding paragraphs as if fully set forth herein.

72.     At all times material, Defendant, MEAD, was engaged in the sale, marketing, design, manufacture, and/or distribution of cow's milk-based products which are defectively designed and/or unreasonably dangerous to consumers, including Baby Chace.

73.     At all times material, Defendant, MEAD, as the manufacturer and/or seller of the products at issue in this litigation, had a responsibility to manufacture, sell, and distribute its products in a manner that was not unreasonably dangerous.

74.     At all times material, Defendant, MEAD's products contained cow's milk at the time they left the manufacturing facility and were placed into the stream of commerce for nutritional use for preterm infants and thus were in a defective and/or unreasonably dangerous condition.

75.     At all times material, Defendant, MEAD, specifically created and marketed its cow's milk-based products for use as nutrition and nutritional supplements for preterm infants, like Baby Chace.

76.     Defendant, MEAD's cow's milk-based products are expected to and do reach the user without substantial change affecting that defective and/or unreasonably dangerous condition.

77.     An ordinary consumer would not expect Defendant, MEAD's cow's milk-based products to carry a significant risk of serious injury and death from NEC.

78. At all times material, Defendant, MEAD, knew or reasonably should have known that cow's milk-based nutrition was unreasonably dangerous to preterm infants as it carried a significantly increased risk of those infants developing NEC, devastating injury, and/or death.

79. At all times material, Defendant, MEAD, knew or reasonably should have known that the risks involved in feeding a preterm infant cow's milk-based nutrition outweighed the benefits.

80. At all times material, Defendant, MEAD, knew or reasonably should have known that human milk-based nutrition did not carry the same risks of NEC, devastating injury, and/or death that its own cow's milk-based products do.

81. At all times material, Defendant, MEAD, did not develop a human milk-based product that was safer for premature infants, nor did it reformulate its products to reduce the risk of NEC, devastating injury, and death.

82. At all times material, developing a human milk-based product was economically feasible.

83. At all times material, pasteurized human milk was an available alternative.

84. At all times material, Defendant, MEAD, knew or reasonably should have known that its cow's milk-based products would be used – unaltered – to feed preterm infants like Baby Chace.

85. Defendant, MEAD's cow's milk-based products were in fact fed – unaltered – to Baby Chace.

86. As a direct and proximate result of Baby Chace's ingestion of Defendant, MEAD's cow's milk-based products, he developed NEC and suffered serious bodily injuries.

14

WHEREFORE, Plaintiff, MONIQUE WYATT, Individually, and as Mother of CHACE WHITE, a deceased Minor, prays for judgement against Defendants, MEAD JOHNSON & CO., LLC and MEAD JOHNSON NUTRITION COMPANY, which will fairly and adequately compensate their loss, damages and injuries.

### COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### *Mead Johnson & Co., LLC & Mead Johnson Nutrition Co.*

87.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

88.     Defendant, MEAD's products contained cow's milk at the time they left the manufacturing facility.

89.     At all times material, an ordinary consumer would not expect Defendant, MEAD's cow's milk-based products to carry a significant risk of devastating injury and death from NEC.

90.     At all times material, Defendant, MEAD, knew or should have known that cow's milk-based nutrition was unreasonably dangerous as it carries a significantly increased risk of premature infants developing NEC, devastating injury, and death.

91.     At all times material, Defendant, MEAD, knew or should have known that the risks involved in feeding a premature infant cow's milk-based nutrition outweighed the benefits.

92.     At all times material, Defendant, MEAD, knew or should have known that human milk-based nutrition did not carry the same risks of NEC, devastating injury, and death that its own cow's milk-based products do.

93.     By designing its products with cow's milk ingredients, Defendant, MEAD, was required to warn the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, devastating injury, and death.

94. Defendant, MEAD, as the manufacturer and/or seller of the infant products at issue in this litigation, was required to provide adequate warnings or instructions about the dangers and risks associated with the use of its cow's milk-based products with preterm infants, specifically including, but not limited to the risk of NEC, devastating injury, and death.

95. Defendant, MEAD, as the manufacturer and/or seller of cow's milk-based products, was unreasonable in relying upon any intermediary, including physicians and/or other healthcare providers and staff, to fully warn the user of the hidden dangers and risks in its cow's milk-based products as the magnitude of the risk involved in using Defendant's cow's milk-based products with preterm infants is significant and involves the real danger of serious bodily injury and death.

96. Defendant, MEAD, as the manufacturer and seller of cow's milk-based products, owed a duty to fully warn and instruct any intermediary, including physicians and/or other healthcare providers and staff, of the significant dangers inherent in its cow's milk-based products.

97. In addition, and/or in the alternative, had physicians and/or other healthcare providers and staff been properly instructed and warned of the extreme risks associated with the use of cow's milk-based products with preterm infants, they would not have used such a dangerous product with Baby Chace.

98. Had Baby Chace's Mother known of the significant risks of feeding Baby Chace Defendant, MEAD's cow's milk-based products, she would not have allowed such products to be fed to her child.

99. Had Baby Chace's Mother known of the significant risks of feeding Baby Chace Defendant, MEAD's cow's milk-based products, she would not have fed such products to her child.

100.    Defendant, MEAD's failure to warn of the unreasonable risk of harm posed by the ingredients of its cow's milk-based products made those products unreasonably dangerous.

101.    Defendant, MEAD, as a manufacturer, has a duty to hold the knowledge and skill of an expert and is obliged to keep abreast of any scientific discoveries and are presumed to know the result of all such advances.

102.    Defendant, MEAD, through its own testing and studies, consultants and experts, and/or knowledge of the relevant scientific literature available to it, knew of the significant risk of NEC with preterm infants.

103.    Defendant, MEAD, through its knowledge, review and survey of the scientific literature, knew that the use of cow's milk-based products with preterm infants could cause severe injury, including but not limited to NEC and death.

104.    At all times material, Defendant, MEAD, knew or should have known that its cow's milk-based products might cause premature infants to develop NEC, devastating injury, and/or death, yet it failed to provide adequate warnings of those risks. Specifically, Defendant, MEAD, breached its duty by:

    a.  Providing no warnings regarding the risk of NEC and death;

    b.  Providing inadequate labeling that failed to warn of the risks inherent in the use of cow's milk-based products with preterm infants, including but not limited to NEC;

    c.  Failing to warn that cow's milk-based products significantly increased the risk of NEC, devastating injury, and/or death in preterm infants;

    d.  Failing to carry a large and prominent "black box" warning informing consumers that its cow's milk-based products were known to significantly increase the risk of NEC, devastating injuries, and/or death when compared to human milk in preterm infants;

e. Providing severely inadequate, vague, confusing warnings that provide a false sense of security by warning of certain conditions but failing to warn that the use of cow's milk-based products significantly increase the risk of NEC and death;

f. Failing to disclose well-established studies and/or statistical data that evidenced the casual connection between cow's milk-based products and NEC, devastating injuries, and/or death in preterm infants;

g. Failing to insert a warning and/or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed Enfamil products, notwithstanding their substantial risks;

h. Failing to send out "Dear Dr." letters warning of the risks of NEC, devastating injuries, and/or death and the current scientific research and data to guide the hospitals and physicians to better care for the extremely preterm infants;

i. Failing to otherwise warn physicians and healthcare providers of the extreme risk associated with feeding preterm infants cow's milk-based formula;

j. Failing to provide a warning in a method reasonable calculated or expected to reach parents of preterm infants;

k. Failing to provide proper instructions, guidelines, studies, or data on when and how to feed Enfamil products to preterm infants in order to decrease the risk of NEC, devastating injuries, and/or death;

l. Failing to utilize current up-to-date medical data on the proper and safe use of its product; and/or

m. Failing to instruct or warn that an exclusive human milk-based diet significantly decreased the risk of NEC, devastating injuries, and/or death when compared to a diet containing cow's milk.

105. As a direct and proximate result of Defendant, MEAD's failure to warn, Baby Chace was fed Defendant, MEAD's cow's milk-based products.

106. As a direct and proximate result of Baby Chace's ingestion of Defendant, MEAD's cow's milk-based products, Baby Chace developed NEC and suffered serious bodily injuries resulting in his death.

18

WHEREFORE, Plaintiff, MONIQUE WYATT, Individually, and as Mother of CHACE WHITE, a deceased Minor, prays for judgment against Defendants, MEAD JOHNSON & CO., LLC and MEAD JOHNSON NUTRITION COMPANY, which will fairly and adequately compensate their loss, damages, and injuries.

### COUNT III: NEGLIGENCE
*Mead Johnson & Co., LLC & Mead Johnson Nutrition Co.*

107.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.    At all times material, Defendant, MEAD, as the manufacturer and/or seller of the products at issue in this litigation, owed a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products were used in their intended manner for their intended purpose.

109.    At all times material, Defendant, MEAD, as the manufacturer and/or seller of the products at issue in this litigation, had a duty to act as a reasonably prudent manufacturer to aggressively and promptly take significant actions to reduce the risks of its products causing NEC, devastating injuries, and/or death in premature infants.

110.    At all times material, Defendant, MEAD, as the manufacturer and/or seller of the products at issue in this litigation, owed a duty to hold the knowledge and skill of an expert, and was obliged to keep abreast of any scientific discoveries and is presumed to know the result of all such advances.

111.    At all times material, Defendant, MEAD, as the manufacturer and/or seller of the products at issue in this litigation, knew or reasonably should have known that its cow's milk-based infant products significantly increased the risk of NEC, devastating injuries, and death.

112.    At all times material, Plaintiff, Baby Chace, his parents, and his healthcare providers used the products at issue in their intended manner and for their intended purpose.

113.    Defendant, MEAD, failed to act in a reasonably prudent manner and breached their duty by:

    a.  Designing the products such that there are latent and not obvious dangers for consumers and patients while the products are being used in a foreseeable and intended manner;

    b.  Failing to collect data to determine if the products were safe for preterm infants;

    c.  Failing to collect data to determine when and how its products could be used safely;

    d.  Failing to utilize the significant peer-reviewed research to develop instruments;

    e.  Failing to develop evidence-based guidelines or instructions to decrease the risk of its products causing NEC and death;

    f.  Failing to stop or deter its products from being fed to extremely preterm infants like Baby Chace;

    g.  Failing to provide evidence-based instructions or guidance on when or how a preterm infant should be transitioned to the products;

    h.  Failing to continuously and vigorously study its cow's milk-based products in order to avoid NEC and death in preterm infants;

    i.  Failing to utilize economical and technically available safer manufacturing and/or design alternatives for the preterm infant formula and fortifier;

    j.  Failing to adopt an adequate or sufficient quality control program;

    k.  Failing to inspect or test its products with sufficient care;

    l.  Continuing to utilize outdated and ineffective instructions and warnings knowing they were inadequate based on modern science;

    m.  Failing to market and/or sell its products in a way which would protect the preterm infants from NEC, devastating injuries, and/or death;

    n.  Improperly creating agreements with hospitals whereby its products would be over-utilized to the detriment of the preterm infants;

o.  Improperly promoting continued use of its products in hospitals despite knowing of the great harm they were causing to preterm infants; and/or

p.  Improperly providing free and/or reduced-price Enfamil products to hospitals.

114.   As a direct and proximate result of the negligence of Defendant, MEAD, Baby Chace developed NEC and suffered serious bodily injuries resulting in his death.

WHEREFORE, Plaintiff, MONIQUE WYATT, Individually, and as Mother of CHACE WHITE, a deceased Minor, prays for judgment against Defendants, MEAD JOHNSON & CO., LLC and MEAD JOHNSON NUTRITION COMPANY, which will fairly and adequately compensate their loss, damages, and injuries.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### *Mead Johnson & Co., LLC & Mead Johnson Nutrition Co.*

115.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

116.   At all times material, Baby Chace, by and through his physicians, medical professionals, medical staff, nurses, and his family, used Defendant, MEAD's cow's milk-based products in their intended manner for their intended purpose.

117.   Defendant, MEAD, intentionally made false statements of material fact on an ongoing and repeated basis to consumers, physicians, and parents in their advertising and promotional materials prior to the time Baby Chace was fed its products, including but not limited to:

a.  That its cow's milk-based products were safe and beneficial for preterm infants;

b.  That its cow's milk-based products were necessary to the growth and nutrition of preterm infants;

c.  That its products had no serious side effects;

d.  That cow's milk-based products were safe for preterm infants;

21

    e.    That cow's milk-based products were similar or equivalent to breast milk;

    f.    That Enfamil products were safe and more like breast milk than other infant products; and/or

    g.    That its products were based on up-to-date science, which made them safe for preterm infants

118.    At all times material, Defendant, MEAD, believed and/or knew the above statements to be false.

119.    At all times material, Defendant, MEAD's misrepresentations were intended to induce hospitals, healthcare providers, and parents to provide Defendant, MEAD's cow's milk-based products to babies, including Baby Chace.

120.    Defendant, MEAD's misrepresentations did in fact induce Plaintiff, MONIQUE WYATT, to allow her child to be fed Defendant, MEAD's cow's milk-based products in justifiable reliance on all the messaging she received about formula feeding, including, directly or indirectly, Defendant, MEAD's messaging.

121.    As a direct result, Defendant, MEAD's cow's milk-based products were fed to Baby Chace.

122.    As a result of Baby Chace being fed Defendant, MEAD's cow's milk-based products, Baby Chace developed NEC and suffered serious bodily injuries resulting in his death.

WHEREFORE, Plaintiff, MONIQUE WYATT, Individually, and as Mother of CHACE WHITE, a deceased Minor, prays for judgment against Defendants, MEAD JOHNSON & CO., LLC and MEAD JOHNSON NUTRITION COMPANY, which will fairly and adequately compensate their loss, damages, and injuries.

## COUNT V: NEGLIGENT MISREPRESENTATION
### *Mead Johnson & Co., LLC & Mead Johnson Nutrition Co.*

123.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

124.    At all times material, Baby Chace, by and through his physicians, medical professionals, medical staff, nurses, and her family, used Defendant, MEAD's cow's milk-based products in their intended manner and for their intended purpose.

125.    At all times material, Defendant, MEAD, as the manufacturer and/or seller of the products at issue in this litigation, owed a duty to provide truthful, accurate, fulsome information about the risk and benefits of using its products when used in the intended manner and for the intended purpose.

126.    Defendant, MEAD, breached its duty by negligently and/or carelessly making false statements of material fact to consumes, physicians, and medical staff in its advertising and promotional materials prior to the time Baby Chace was fed Enfamil products, including but not limited to:

      a.    That its cow's milk-based products were safe and beneficial for preterm infants;

      b.    That its cow's milk-based infant formula products were necessary to the growth and nutrition of preterm infants;

      c.    That its products had no serious side effects;

      d.    That cow's milk-based infant formula products were safe for preterm infants;

      e.    That cow's milk-based infant formula products were similar or equivalent to breast milk;

      f.    That Enfamil products were safe and more like breast milk than other infant products; and/or

      g.    That its products were based on up-to-date science, which made them safer for preterm infants.

127.   At all times material, Defendant, MEAD, knew, reasonably should have known, and/or should have determined that the above-referenced statements were false.

128.   Defendant, MEAD's misrepresentations were intended to induce hospitals and healthcare providers, including Baby Chace's hospital and healthcare providers, to provide Enfamil products to infants, including Baby Chace.

129.   At all times material, Defendant, MEAD's misrepresentations did in fact induce Baby Chace's mother to allow her child to be fed Enfamil products, in justifiable reliance on all the messaging she received about formula feeding, including Defendant, MEAD's messaging.

130.   As a result of Baby Chace being fed Defendant, MEAD's cow's milk-based products, Baby Chace developed NEC and suffered serious bodily injuries resulting in his death.

WHEREFORE, Plaintiff, MONIQUE WYATT, Individually, and as Mother of CHACE WHITE, a deceased Minor, prays for judgment against Defendants, MEAD JOHNSON & CO., LLC and MEAD JOHNSON NUTRITION COMPANY, which will fairly and adequately compensate their loss, damages, and injuries.

### COUNT VI: CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
#### *Mead Johnson & Co., LLC & Mead Johnson Nutrition Co.*

131.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

132.   Plaintiff brings this count pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act. 815 ILCS 505.

133.   Upon information and belief, Defendant, MEAD, engaged in deceptive acts and/or practices by making the following false statements of material fact on an ongoing and repeated basis prior to the time Baby Chace was fed its products:

    a.   That cow's milk-based products were safe and beneficial for preterm infants;

    b.   That its cow's milk-based products were necessary to the growth and nutrition of preterm infants;

    c.   That its products had no serious side effects;

    d.   That cow's milk-based products were safe for preterm infants;

    e.   That cow's milk-based products were similar or equivalent to breast milk;

    f.   That Enfamil products were safe and more like breast milk than other infant products; and/or

    g.   That its products were based on up-to-date scient; which made them safe for preterm infants.

134.    Defendant, MEAD, further engaged in deceptive acts or practices by omitting the material fact that their products significantly increased the risk of NEC, devastating injuries, and/or death in premature infants.

135.    The aforementioned deceptive acts and/or omissions occurred in the course of conduct involving commerce.

136.    Defendant, MEAD's deceptive practices were intended to induce Plaintiff, MONIQUE WYATT, to allow Baby Chace to be fed Defendant, MEAD's cow's milk-based products, in reliance on all the messaging she received about formula feeding, including, directly or indirectly, Defendant, MEAD's messaging.

137.    Defendant, MEAD's deceptive practices were intended to induce hospitals and healthcare providers, including Baby Chace's hospital and healthcare providers, to provide cow's milk-based products to infants, including Baby Chace.

138.    Had Defendant, MEAD, not committed these deceptive practices, Baby Chace would not have been exposed to Defendant, MEAD's unreasonably dangerous cow's milk-based products, and thus would not have developed NEC and suffered serious bodily injuries.

WHEREFORE, Plaintiff, MONIQUE WYATT, Individually, and as Mother of CHACE WHITE, a deceased Minor, prays for judgment against Defendants, MEAD JOHNSON & CO., LLC and MEAD JOHNSON NUTRITION COMPANY, which will fairly and adequately compensate their loss, damages, and injuries.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment as follows:

1.      That process issue according to law;

2.      That Defendants be served with a copy of Plaintiffs' Complaint For Damages and show cause why the prayers for relief requested by Plaintiffs herein should not be granted;

3.      That the Court enter a judgment against Defendants for all general and compensatory damages allowable to Plaintiffs;

4.      That the Court enter a judgment against Defendants for all special damages allowable to Plaintiffs;

5.      That Plaintiffs recover all possible damages for the wrongful death of Baby Chace;

6.      That the Court enter a judgment against Defendants for all other relief sought by Plaintiffs under this Complaint;

7.      That the costs of this action be cast upon Defendants; and

8.      That the Court grant Plaintiffs such further relief which the Court deems just and appropriate.

By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury as to all issues.

Dated: February 3, 2023

                                    Respectfully Submitted,
                                     MURPHY LAW FIRM, LLC

                                     */s/ Peyton P. Murphy*
                                     Peyton P. Murphy (LA Bar #22125)
                                     2354 S. Acadian Thruway
                                     Baton Rouge, LA 70808
                                     Tel: (225) 928-8800
                                     Fax: (225) 246-8780
                                     Email: Peyton@MurphyLawFirm.com

                                          and

                                     COMEAUX LAW FIRM
                                     */s/ Todd C. Comeaux*
                                     Todd C. Comeaux (LA Bar #23453)
                                     2354 S. Acadian Thruway, Suite C
                                     Baton Rouge, LA 70808
                                     Tel: (225) 706-9000
                                     Fax: (225) 706-9001
                                     Email: TC@ComeauxLawFirm.com

                                     ***Attorneys for Plaintiff***